# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**ADVANTAGE ROOFING AND**
**CONSTRUCTION OF LOUISIANA, INC.**

                                       **CIVIL ACTION**

**VERSUS**

                                       **NO. 16-677-JWD-RLB**

**LANDMARK AMERICAN INSURANCE**
**COMPANY, ET AL.**

## RULING AND ORDER

This matter comes before the Court on the *Motion for Summary Judgment* (Doc. 61) filed by Arrow, LLC d/b/a Central Roofing, FCCI Insurance Company, and National Trust Insurance Company (collectively, "Central Roofing").  Plaintiff Advantage Roofing and Construction of Louisiana, Inc., ("Advantage") opposes the motion. (Doc. 71.)  Central Roofing has filed a reply. (Doc. 72.)  Oral argument is not necessary.  The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule.

For the following reasons, Central Roofing's motion is granted in part and denied in part. The motion is granted in that Advantage has failed to demonstrate a question of fact on three key issues: (1) the Scope of Work  and Specifications required that all foam had to be removed from the roof of the Project; (2) Advantage directed Central Roofing to leave the old foam in place and install the new roof over the old foam; and (3) Central Roofing's work had to be redone completely because the old foam had not been removed, as required by the SOW and Specifications. Consequently, the Court agrees with Central Roofing: because all of Central Roofing's work had to be redone in its entirety, as a matter of law, most of Advantage's damages were not caused by any breach or negligence by Central Roofing.

However, Advantage has demonstrated a question of fact on part of its damage claim. Specifically, a reasonable jury could conclude that Central Roofing caused Advantage damages for the roofing materials that were damaged by the rains, that could not be reused, and that needed to be replaced. As a result, in all respects except the materials, Central Roofing's motion is granted, and Advantage's claim for damages is dismissed.

All other pending motions are denied without prejudice. Central Roofing shall have an opportunity to revise and refile these motions in light of this ruling, if Central Roofing believes they are still necessary.

## I. Relevant Factual Background

### A. Overview of the Project

In September 2014, the United States Army solicited bids to repair the roof on Building 373 at the Red River Army Depot in Texarkana, Texas. The Army's principal engineer was Russell Meadows.

The general contractor for the Project was Four Thirteen, Incorporated. Four Thirteen's principal was J.L. Estill.

Four Thirteen contracted with Plaintiff Advantage to perform part of the roofing repairs. Advantage's principal is Jimmy Strawbridge.

Advantage entered into a subcontract with Defendant Central Roofing to provide labor only for part of the work. Central Roofing's principal is Chris Creely.

Central Roofing entered into a sub-subcontract with Colonial Roofing. Colonial performed part of the work.

**B. The Scope of the Work and Specifications**

On September 2, 2014, the Army issued an initial Scope of Work for Repair Leaking Roof on Building 373 in Texarkana, Texas (the "SOW"). (Dep. of Russell Meadows 18:11–20, Doc. 61-3; Dep. of J.L. Estill 13:19–14:1, Doc. 61-4; Def. Ex. 2, Doc. 61-8).[1] On September 8, 2014, the Army issued Specifications for Roof Repair and Paint Exterior of BLDG 373 (the "Specifications"). (Estill Dep. 14:2–6, Doc. 61-4; Def. Ex. 3, Doc. 61-9).[2]

The plain language of the SOW and Specifications required that all foam be removed from the roof. Specifically, the SOW provided:

Work shall include, but is not limited to, the following items: . . .

    c. Replace roof system on Dyno Bldg 373. . . .

        a) **Remove existing foam roofing**, EPDM roof system, and all other roofing from concrete deck roof to provide an acceptable surface for application of new roofing material. . . .

        s) Install new PVC roof system on concrete roof. . . .

    e. Repair leaking metal roof as shown.

        a) **Remove existing foam roofing for application of new roofing system.**

        b) Install new PVC roof system on metal roof.

(Def. Ex. 2, Doc. 61-8 (emphasis added).)

The Specifications stated in the first paragraph (entitled "Scope"): "The project is to remove existing roofing and install PVC Roofing System complete, install Steel Sheet Roofing

---

[1] Strawbridge described it as "the preliminary specifications that the Corp of Engineer – or that Russell Meadows puts out for the job. . .[A] lot of it pertains to the roof is what we gave the price on. The rest of it, Four Thirteen would have gave a price on the whole thing." (Dep. of Jimmy Strawbridge 33:5–34:3, Doc. 61-5.)

[2] Strawbridge testified that the "September 8 ones are the ones that are going to control." (Strawbridge Dep. 41:17–21, Doc. 61-5.)

complete, and apply Acrylic Wall Coating." (Def. Ex. 3, Doc. 61-9.)  Advantage highlights that

the Specifications do not discuss in detail removal of the foam.

Russell Meadows was the primary author of the Specifications and SOW (Meadows Dep.

19:2–5, Doc. 61-3; *id.* 9:15, Doc. 71-2.)[3]  Meadows also made the decision that the roof needed to

be replaced. (Meadows Dep. 12:18–20, Doc. 71-2.)  Meadows testified that the Specifications

called for "[a]ll foam to be removed down to the substrate" and that this requirement did not

change. (Meadows Dep. 31:3–9, Doc. 61-3 at 8.)

### C.  Early Negotiations between Four Thirteen and Advantage

On September 9, 2014, J.L. Estill of Four Thirteen (the general contractor) sent Jimmy

Strawbridge of Advantage Roofing an email attaching "addenda #1" on the Building 373 Roofing

job. (Pl. Ex. C, Doc. 71-4.) The specification stated in its Scope in part:

> This specification covers the work, material, and related labor to remove and install
> roofing to Bldg 373 at the Red River Army Depot; west of Texarkana, Texas.  This
> project is to remove existing roofing and install PVC Roofing System complete,
> install Steel Sheet Roofing complete, and apply Acrylic Wall Coating.

(Pl. Ex. C, Addendum 1, Doc. 71-4.)  Addendum 1 also said under the "DETAILED SPECIFIC

REQUIREMENTS": "3. PVC Roof System: Duro-Last PVC membrane or approved equal

meeting the following", with specific attributes then listed. (Pl. Ex. C., Addendum 1, Doc. 71-4 at

4–5.)  A warranty is also described that included: "Damage due to wind loads and uplift as per

requirements in ASCE 7-10 and the IBC." (Pl. Ex. C, Addendum 1, Doc. 71-4 at 4–5.)

On September 15, 2014, Estill sent Strawbridge an email which stated in relevant part:

> Please review attached scope from Parsons and confirm that you have everything
> that they have.

---

[3] Advantage highlights that Meadows had no formal training with designing or writing scopes for roofing and that this
Project was one of his "first to write." (Meadows Dep. 109:2–5, 110:19–25, Doc. 71-2.)  Meadows had previously
watched over the installation of two roofing systems, but they were adhesively applied, not mechanically fastened.
(Meadows Dep. 111:7–112:21, Doc. 71-2.)  The Court notes these facts but finds them irrelevant.

Do you have the new purlins and new gutter for the metal roof that gets replaced?

Are you quoting the specified Acrylic or something else for the metal roof that gets an elastomeric coating?

(Pl. Ex. D, Doc. 71-5.) The "attached scope" was a letter from Parsons Roof System for the RRAD Building 373 Project, and Item 2 of that scope stated, "Scrape existing foam over metal roofs down to metal ribs at 2 roof locations". (Pl. Ex. D, Doc. 71-5.) Advantage argues from this that "[t]he Parsons quote did not require complete removal of the foam in the bottom of the R-Panels between the ribs." (Opposition, Doc. 71 at 3.)

Four Thirteen placed a bid to perform the work on Building 373. (*See* Def. Ex. 84, Doc. 61-26.)

On September 16, 2014, Advantage Roofing submitted a bid to Four Thirteen on "Roof repair at Red River Army Depot Building #373," which was a proposal Advantage gave for "all the roofs." (Def. Ex. 4, Doc. 61-10; Strawbridge Dep. 43:22–25, Doc. 61-5.) On the same day, Advantage submitted a revised bid. (Def. Ex. 5, Doc. 61-11.)

### D. Four Thirteen's Contract with the Government and Subcontract with Advantage

On September 29, 2014, the Army awarded the contract to Four Thirteen. (Def. Ex. 84, Doc. 61-26; Meadows Dep. 25:15–17.) On October 3, 2014, Four Thirteen informed Advantage via email that they were awarded the job and that it would be sending Advantage a subcontract for the PVC roofing in the amount of $648,375.00. (Def. Ex. 6, Doc. 61-12 at 2; Strawbridge Dep. 52:13–53:10, Doc. 61-5 at 13–14.)

On October 6, 2014, Four Thirteen and Advantage entered into a subcontract to perform certain work on the roof per the September 16, 2014 quote. (Def. Ex. 8; Estill Dep. 20:6–17, Doc. 61-4 at 5; Strawbridge Dep. 68:21–69:12, Doc. 61-5.) The September 16, 2014, provides that

Advantage will complete the following, among other things: "Clean foam from metal roofs at two locations as much as possible to achieve level surface." (Def. Ex. 5.)[4] Advantage's corporate deponent testified that Advantage's intent was that "the foam be cleaned on the two locations as much as possible to achieve a level surface" and "to install the new roof over the old foam. . . . [T]he old foam would remain in place after it was leveled." (Rule 30(b)(6) Dep. of Advantage . . . ("Advantage Dep.") 88:25–89:12, Doc. 61-6.)

Meadows testified that the government had the contract with Four Thirteen. (Meadows Dep. 87:3–7, Doc. 61-3.) Meadows stated:

> How 413 and his subs write their agreements and their contracts and subcontracts is upon them . . . [F]or our decision making, it is the contractor we're responsible to. If they have a subcontract, . . . [w]hatever is written in their subcontract, I'm not privy of and I really don't want to be privy of.

(Meadows Dep. 87:9–18, Doc. 61-3.) In sum, "in the grand scream (sic) of this, 413 is responsible to [the government]. And his subs, most normally, are responsible to him." (Meadows Dep. 87:20–22, Doc. 61-3.)

On October 31, 2014, Advantage sent Four Thirteen a series of emails attaching certain product submittals. (*See* Pl. Ex. I, Doc. 71-9.) On November 7, 2014, Estill sent Meadows an email with the following: "Russell, Transmittal #541-13-06 covering coating for Bldg 373 is attached for your review and approval." (Pl. Ex. J, Doc. 71-10.) On November 18, 2014, Meadows

---

[4] The revised bid provides in greater detail:

> (B) Clean foam from metal roofs at two locations as much as possible to achieve level surface.
> 1. Mechanically attach a 1" polyisocrynurate & a 1/2" secureock cover board over metal roof area per FM requirement.
> 2. Mechanically attach .060 Carlisle PVC membrane over securerock & through the metal decking.
> 3. Install all flashing & penetrations per Carlisle specifications.
> 4. 20 year NDL labor & material warranty.

(Def. Ex. 5, Doc. 61-11.)

responded that he approved. (Pl. Ex. J, Doc. 71-10.)  On December 11, 2014, Meadows responded to what appears to be a follow up email by Estill with the following: "I found the email from you. I was the bottleneck.  The warranty is acceptable with the addition of the hail as mentioned in his letter.  Roofing material is approved." (Pl. Ex. K, Doc. 71-11.)

On November 20, 2014, the Army issued an official Notice to Proceed to Four Thirteen, which Estill said is "when [his] time that's allocated for the job start[ed]." (Def. Ex. 67, Doc. 61-21; Estill Dep. 20:18–21:6, Doc. 61-4.)

### E. Advantage's Subcontract with Central Roofing and Central Roofing's Subcontract with Colonial Roofing

On April 14, 2015, Strawbridge sent Chris Creely of Central Roofing the Specifications for the Project. (Pl. Ex. L, Doc. 71-12.)  On April 22, 2015, Creely responded by providing a price quote for the labor. (Pl. Ex. M, Doc. 71-13.)  Creely testified that he believed he gave an estimate on this job without seeing any specifications or drawings. (Central Roofing and Creely Dep. 83:17–20, Doc. 71-14.)  On September 21, 2015, Creely provided another price quote to Strawbridge, and, on the same day, Strawbridge accepted this price. (Pl. Ex. O, Doc. 71-15.)

Central Roofing contracted to provide labor for the job; Advantage would furnish the materials, hoists, forklifts, supplies, "and all that stuff for the job[.]" (Strawbridge Dep. 99:10–21, 150:7–10, Doc. 61-5.)

Building 2 and 3 together were phase two of the Project. (Strawbridge Dep. 125:11–20, Doc. 61-5.)  Strawbridge testified that, as of the time that work started on phase two, Central Roofing's work on phase one was fine; Strawbridge said, however, that it was unfinished because the damage that was later sustained to the second roof required changes to certain items that went into the first roof. (Strawbridge Dep. 112:9–23, Doc. 61-5.)

Central Roofing brought in Colonial Roofing, the Pérezes, to perform the work on phase two. (Strawbridge Dep. 125:21–24, Doc. 61-5.)  Strawbridge first became aware that Chris Creely was bringing in a different crew on October 2, when Strawbridge saw them on the job site. (*See* Strawbridge Dep. 125:21–126:19, Doc. 61-5.)

Strawbridge stated that Colonial was not required to "take [the foam] down to the roof ridges[.] . . . [a]s long as it was where the ridges were showing to the point you could put the 1-inch board on top and then the half-inch Securock." (Strawbridge Dep. 154:10–21, Doc. 61-5.)  He then stated though that Colonial was "required to take the foam off down to the ridges[,]" pointing to that part of Advantage's quote which says, "Clean foam from metal roof at two locations as much as possible to achieve level surface." (Strawbridge Dep. 154:24–155:7, Doc. 61-5.)  He was asked shortly thereafter, "Is there anything in your documents that requires the subcontractor to go down to the ridges?", and Strawbridge answered: "No. . . . But it does say that it has to be level." (Strawbridge Dep. 155:22–156:5, Doc. 61-5.)

Similarly, Advantage testified at its corporate deposition that James Strawbridge "told Chris Creely with Central Roofing to have his crews level the foam as much as possible and install the new roofing material over the old foam." (Advantage Dep. 89:19–23, Doc. 61-6.)

This was consistent with Creely/Central Roofing's deposition; Creely was asked, "what was the work you were asked to do on Building 2", and he replied, "Basically it was to level out the foam roof that was there and then install a cover board and TPO membrane." (Central Roofing and Creely Dep. 21:14–22, Doc. 61-7.)  Creely said he was contracted to do the same thing on Building 3. (Central Roofing and Creely Dep. 22:18–22, Doc. 61-7.)

Advantage highlights that, with respect to buildings 2 and 3, when Central Roofing subcontracted with Colonial, Central Roofing conveyed the scope of the work to Colonial Roofing

verbally. (Central Roofing and Creely Dep. 33:15–19, Doc. 71-14.)    In any event, on September 23, 2015, Colonial sent Creely a Proposal Acceptance letter. (Pl. Ex. Q, Doc. 71-17.)  The first specification is, "1.0 Scheme off foam roof surface." (Pl. Ex. Q, Doc. 71-17.)  On the same day, Creely signed the letter. (Pl. Ex. R, Doc. 71-18.)

### F. Government First Discovers Issues with the Roof and Orders a Work Stoppage

About a week after Colonial began work, around October 14, 2015, Meadows, the RRAD engineer, inspected the roof; he testified:

> But while standing there, we were looking and we said, they haven't removed all the foam off this roof.  And so we questioned them about it.  And one of the guys said, well, we took it down to where we thought it could get smooth and then starting putting back.  And we told them that was not correct, who told them to do that.  And if I remember correctly, say said (sic) Chris told us to do it that way.  Well, Chris being Chris Creely, I believe.

(Meadows Dep. 33:1–10, Doc. 61-3; *see also* Central Roofing and Creely Dep. 35:24–36:5, Doc. 61-7.)

Meadows testified that the Project was shut down because all of the foam was not removed. (Meadows Dep. 37:20–38:5, Doc. 61-3.)  Meadows said:

> Q:      I'm just trying to get you to comment on why was it shut down.
>
> A:      The official shut down was because they didn't remove all the foam.
>
> Q:      Okay.
>
> A:      It was not based on the decking material. It was based on the foam.  We might have told them they needed to not install any more DensDeck or any more Securock from the manufacturer.  But that did not stop them from doing removal and putting the foam board down.

(Meadows Dep. 37:20–38:5, Doc. 61-3.)  Meadows stated later: "The job was shut down because they didn't follow the scope [which was to] [r]emove all the foam." (Meadows Dep. 61:4–11, Doc. 61-3.)  He continued:

> The job was shut down upon my speaking with Jim Estill, 413, due to the fact that the contractor left spray foam on the roof without removing it in full; therefore, leaving the roof system that he had installed being incorrect.  That's not worded in a good way.
> Because they did not remove the spray foam is why it was shut down.  The question did come up as to the type of material that they had on job site that they were using because there were areas we could see that was not completely covered by the membrane that had Securock and other areas that had Densdeck.  And then we saw a pallet of the material sitting over there and knew that we didn't approve both.  So we told them while we're looking at this, we also need to verify that the deck material, the dense rock, the gyp board needs to be what is approved by the membrane manufacturer.
> And so during the process, we got confirmation.  I don't – do not believe we ever shut the job down for any lengthy time due to the gyp board.  Gyp board being DensDeck or Securock.
> . . . It had to do with the fact that, as his employee said, Chris said do it this way.  Don't take all the foam off.

(Meadows Dep. 62:14–63:14, Doc. 61-3.)

When Creely was asked what, to his knowledge, led to the work stoppage, Creely similarly testified that he "got a phone call saying that people were on the roof and didn't like the way that the foam had not been removed or wasn't level enough and told [Central Roofing] not to do any more work and to get off the roof." (Central Roofing and Creely Dep. 36:19–37:3, Doc. 61-7.)

On October 8, 2015, Meadows sent an email to Estill stating:

> We have a few issues that have come to light on the 373 roofs.  It is my feeling that we may should have a meeting with you and your sub-contractors performing the roof work. . . . From speaking with one of the employees on site, they are getting poor instruction pertaining to the requirements of the job.

(Def. Ex. 24, Doc. 61-14.) Meadows asked for a meeting with Estill's subs. (Def. Ex. 24, Doc. 61-14; Pl. Ex. P, Doc. 71-16.) On the same day, Estill forwarded the email to Strawbridge and requested a meeting. (Def. Ex. 24, Doc. 61-14; Pl. Ex. P, Doc. 71-16.)

### G. October Meeting About Roof Problems

Thereafter, around October 14, 2015, Meadows met with Creely, Strawbridge, and others (and afterward went on the roof); during this meeting, the government "reiterated to them that it had to be taken down to the deck, meaning everything off the deck" so that they could see if the roof was "rusted through and then go back with it." (Meadows Dep. 39:2–22, Doc. 61-3.) Meadows expected that, going forward, the roofing system that had been installed would be removed and that the spray foam would be "removed completely down to the steel deck as proposed originally"; that is, "everything that was there, as of that point in [Meadow's] mind, needed to come off and be put back on as per specifications[.]" (Meadows Dep. 64:7–22, Doc. 61-3.) Meadows said that, because they lost material because it got wet and because it was installed incorrectly, the Government was going to allow them to reuse what they could if it was good structurally. (Meadows Dep. 66:19–68:4, Doc. 61-3.) But, as Meadows testified, "all that had to come off in any event[.]" (Meadows Dep. 67:3–4, Doc. 61-3.) In sum, "the government stance [at the October 14, 2015, meeting] was that building No. 3 and building No. 2 need[ed] to be completely removed, all the roofing that was put on and brought back to the state of what was mentioned, what was required by the scope," and Meadows relayed that during the meeting. (Meadows Dep. 177:5–23, Doc. 61-3.)

Creely similarly described the October 14, 2015 meeting as follows:

The Army went over the specs with Mr. Strawbridge and they discussed whether we were able to – they discussed the fact that the foam was supposed to all come off the roof. And then we were kind of back and forth on that and then we adjourned over to the building.

I think during the meeting the tone from the Army was all the foam had to come off, that's what the specs said, we were very clear, but at the same time there seemed to be a little bit of a willingness for them to go look at the building and see if it was possible to continue basically.

So once we got over to the building, they looked at the building and decided that we could not continue, and we adjourned.

(Central Roofing and Creely Dep. 40:23–41:16, Doc. 61-7.)

Meadows also testified that Strawbridge complained that there was no amounts built into the contract for the flute filler (Meadows Dep. 43:9–44:4, Doc. 61-3), which Central Roofing indicated would be needed once the old foam was removed.

Meadows stated that there was a discussion about partially removing the foam, but Meadows said he never gave them a firm answer of yes (i.e., that they could leave the spray foam in the flutes). (Meadows Dep. 83:12–25, Doc. 61-3.) Meadows reiterated that all Army contracts had to be in writing, so while "there may be a lot of talk, pros and cons, . . . unless we agree to it and put it in writing, there's nothing that says you can do it that way." (Meadows Dep. 84:2–6, Doc. 61-3.) Meadows continued:

But so it was brought up and it was discussed. And it was – and it was considered as a viable solution to keep them from spending more money. But the more – the more we considered it – because the scope was not written to allow them to do that to save money. The scope was written to give us a good product. And any time you have water left on a sub – on a metal substrate, then you're going to have – you're going to have rust. And from what I've understood, that spray foam, once it gets wet, is terrible on roofs. I mean, it's – it increases the amount of rust. So yes, we – we—we listened to them. We considered it. But we never gave them anything in writing say, yes, you can go forward and do that. And then, as we— when we got up on the roof and looked at it and saw exactly what all there was that they had left, you know, it's – it was like step back and just – the scope says do this. Let's do this. There – we're not changing your contract. We're telling you to stick with what you were supposed to do to begin with.

(Meadows Dep. 84:11–85:6, Doc. 61-3.) Meadows testified that he realized during the roof inspection that they had not removed all of the foam and that, from that point forward, he told

Estill that they needed "to take it down, completely removed and start over." (Meadows Dep. 47:20–24, Doc. 61-3.)

### H. Waterproofing the Roof

Creely stated that, after the meeting, Central Roofing did no further work on the Red River buildings 2 and 3. (Central Roofing and Creely Dep. 87:3–6, Doc. 61-7.) Creely stated that he had told Strawbridge that he was going to send people to do more work; "At that point we were going to get the roof tightened up, if you will, buttoned up . . . where it would be [] waterproof . . . , until the Army decided what they were going to do." (Central Roofing and Creely Dep. 87:7–22, Doc. 61-7.) Creely acknowledged that the building was not waterproof as of the date the work stopped. (Central Roofing and Creely Dep. 88:2–4, Doc. 61-7.)

On October 21, 2015, Strawbridge sent Creely an email stating in relevant part:

We have rain coming into Texas this week and the roof is not water tight. You need to get Victor to get the roof protected so it doesn't leak and cause damage to the inside of the building or damage the contents because it could be a tremendous insurance damage claim.

(Pl. Ex. W, Doc. 71-23.)

In response, Creely had Colonial put ballasts up, which meant "[b]asically putting weight on top of the TPO membrane so that it won't blow up. You're just basically weighting the roof down. Bottom line." (Central Roofing and Creely Dep. 89:7–90:3, 100–11, Doc. 61-7.) Creely stated that it was a "temporary fix" and that he would not have expected that to withstand a severe weather event. (Central Roofing and Creely Dep. 89:14–23, Doc. 61-7.) There was nothing from stopping the water from going underneath the membrane, and, as Creely admitted, it is "not really waterproofing the membrane[.]" (Central Roofing and Creely Dep. 90:4–13, Doc. 61-7.)

When asked why he did not make the building water proof, Creely testified: "There was a lot of communication back and forth about waiting on the Army to decide what to do and how to

do, and at that point I think we were told to stand down." (Central Roofing and Creely Dep. 88:11–14, Doc. 61-7.)  Creely was later asked again why he used ballasts rather than make the roof water tight, and he said:

> We couldn't make the building watertight based on the Army not – stopping the work based on the foam. . . . To get the building watertight at that point you would have to finish the roof.  Well, the Army had already told us not to finish the roof because the foam had not been completely removed. [By "finish the roof", Creely meant] you would have to adhere all the TPO, put on edge metal.  Finish the roof; complete the installation . . . There was about two or three days worth of work left to do.

(Central Roofing and Creely Dep. 100:15–102:12, Doc. 61-7.)

Advantage also points to certain alleged admissions Central Roofing made in response to Advantage's petition.  Advantage claims in its petition: "Upon information and belief, at the time the work halted, the roof assembly was not water-tight, as it would have been if the roof was in a finished stage.  If the work had not been stopped, the project would have been completed on or about October 10, 2015." (Doc. 1-2 at 5.)  Central Roofing responds in its answer, "Central Roofing admits the allegations of Paragraph 7 of the Petition as being substantially correct. Central Roofing avers that it was not (sic) the lack of a water tight roof was not attributable to any acts or omissions of Central Roofing." (Doc. 9 at 5.)

Advantage also refers to alleged admissions made by Central Roofing in its answer.  Specifically, Central Roofing asserted the following two affirmative defenses:

> Any damages sustained by the plaintiff occurred because RRAD engineers and/or Four Thirteen, Inc. and/or the plaintiff decided to shut down the project on October 8, 2015 when the roof was not water-tight.
> . . .
> To the extent that the plaintiff suffered any damages, the damages were due to the fact that the building was left exposed to the weather when the roof was not water-tight for an extended and unreasonable period of time. The act of leaving the building exposed to the weather when the roof was not water-tight was not attributable to Central Roofing in any manner.

(Doc. 9 at 3.)

## I. November Meeting

In any event, another meeting occurred on November 18, 2015. (Def. Ex. 69, Doc. 61-22.)

The meeting was between Four Thirteen, Meadows, Advantage, and Central Roofing. (Def. Ex.

69, Doc. 61-22.) According to Meadows and notes from the meeting:

> [the Army] felt like the roofers did not pull off the old foam roof as per the SOW. When they took it off it was apparent that they only knocked off the highs of the bubbles to try and make it level. Plus there was water getting under the insulation at the vent hood locations. We asked them to stop work until everyone could get together for a meeting of what the SOW actually says about the foam roofing removal.

(Def. Ex. 69, Doc. 61-22; Meadows Dep. 69:2–23, Doc. 61-3.) Another note on the same

document provides:

> Had a meeting with Depot, 413, Central Roofing and Advantage Roofing. Discussed what was seen on the roof on 11/11/2015 was not what the scope called for. In the meeting it was conveyed that in the SOW it states that all the old foam roofing comes off down to the highs of the R panels. It was determined that this issue should be between Advantage Roofing and 413. We were told that it would be taking care of by 413. [(sic)] All subs and 413 met in a separate meeting to talk specifics of their contracts but that they all agreed our contract stated that foam should be removed. Then we talked about the building up of the roof vents. 413 will keep up with a total amount of wood and labor and supply it to us for that work.

(Def. Ex. 69, Doc. 61-22; Meadows Dep. 70:6–71:25, Doc. 61-3.)

## J. Advantage's Request for a Change Order and the Government and Four Thirteen's Rejection of Same

Thereafter, on December 10, 2015, Advantage sent a "Change order #2 request" for

"Additional cost to remove & dispose of foam down to expose the metal deck an add the tapered

1" flute filler" (sic) in the amount of $27,319.31. (Def. Ex. 41, Doc. 61-17; Meadows Dep. 72:14–

73:11, Doc. 61-3.)

On December 13, 2015, Estill of Four Thirteen replied to Advantage's change order request as follows:

> Paragraph A.e. from the Scope of Work for Building 373 says "Remove existing foam roofing for application of new roofing system". Why are you requesting additional compensation for this work?
>
> You stated prior to bidding this job that you helped develop specs for RRAD roofing jobs. Why were you not aware of RRAD requirements?

(Def. Ex. 42, Doc. 61-18.) Estill testified that he was not inclined to approve Advantage's request because "the way he was requesting was already within the scope of the work, from [Estill's] interpretation[.]" (Estill Dep. 51:5–19, Doc. 61-4.)

Strawbridge disputed what was contained in Estill's email. (Strawbridge Dep. 197:15–200:4, Doc. 61-5). In short, Strawbridge claimed that Estill had asked him to "just level[] up. It don't come off" in Estill's proposals. (Strawbridge Dep. 197:15–200:4, Doc. 61-5). But Strawbridge acknowledged that there was a "disconnect between what's written on the specifications and what [his] proposal states[.]" (Strawbridge Dep. 200:13–16, Doc. 61-5.)

On December 14, 2015, Meadows sent an email to Estill providing in relevant part:

> CO2 [(Course of Action No. 2)] The SOW called for removal of existing foam roofing for the application of the new roofing system. The intent, of the contract documents was to have all spray foam roofing removed for installation of the new system. This was for several reasons: 1 the spray foam is severely deteriorated. 2 the spray foam has allowed moisture to enter and be trapped between the foam and steel deck. 3 the deck needs to be looked at to verify there are no areas in need of replacement. These were all concerns during the time of writing the SOW.
>     With that being said, I see no reason for the government paying extra for what we scoped in the project. It seems to me that Advantage Roofing should have included this in their pricing to you.

(Def. Ex. 43, Doc. 61-19.) Estill did not remember this specific email, but he knew that Meadows "was of the opinion to start with that the foam had to be removed. . . . That the contract called for

removing it down to the deck . . . [b]ecause . . . it read that way in the statement of work." (Estill Dep. 51:24–52:17, Doc. 61-4.)

Also, on December 14, 2015, Four Thirteen wrote an email to the Army's Contracting Officer explaining Advantage's position and requesting a change order. (Def. Ex. 70, Doc. 61-23; Estill Dep. 53:18–25, Doc. 61-4.) Estill included six points in the email, including:

> 1. The SOW stated to "remove existing foam roofing for application of new roofing…". It did not say to remove all the foam roofing, only to remove enough "for application of new roofing".
> 2. DPW initially agreed to the partial removal approach.
> 3. The existing foam is in such poor condition, not known or described prior to bid, that it needs to be removed. After removal of top portion in some areas it is apparent that moisture has penetrated it in several areas. The extent of the damage to the metal roofing can not be determined without 100% foam removal.
> 4. No mention of a flute filler was made in the SOW nor was a spec provided.
> 5. The government did not pay for a flute filler in the initial bid therefore the contract should be increased to pay for it.

(Def. Ex. 70, Doc. 61-23.) [5]

On December 16, 2015, Meadows responded to Estill's six points and request for a change order. (Def. Ex. 71, Doc. 61-24; Meadows Dep. 78:9–79:12, Doc. 61-3.) As to Point 1, Meadows replied:

> [The SOW] says "Remove existing foam roofing for application of new roofing system". It does not say some of the foam, or just enough for a smooth surface. These are roofers that have installed different types of roofs. They know how a foam roof is installed and the difficulty of removing the foam.

(Def. Ex. 71, Doc. 61-24.) Despite Four Thirteen's argument, Meadows' position remained the same as it had been throughout. (Meadows Dep. 80:10–13, Doc. 61-3.)

---

[5] The sixth point is not at issue. The email provides, "6. Advantage Roofing was not solicited by Four Thirteen to bid this project. They were given the names of all the MATOC bidders by RRAD." (Def. Ex. 70, Doc. 61-23.)

As to Point 2 (the Army's initial agreement to partial removal), Meadows stated: "DPW did offer to allow the foam in the flute to remain, provided it was not holding moisture underneath and was in an acceptable condition for overlay of the new iso board." (Def. Ex. 71, Doc. 61-24.) Again, as Meadows explained at his deposition, there was a discussion, but (a) the idea was never agreed to in writing (as is required), and (b) after inspecting the roof, the Army decided to stick with the SOW. (Meadows Dep. 83:20–85:10, Doc. 61-3.)

As to Point 3 (the poor condition of the foam), Meadows wrote: "The existing foam roof is in poor condition and it was very visible prior to bid. See attached pictures. Damage to the metal roof deck cannot be determined before removal of the foam. If it is damaged. We will determine a repair at that time." (Def. Ex. 71, Doc. 61-24.)

As to Points 4 and 5 (the flute filler)

> 4. DPW     That is correct. We did not spell out every aspect of what needed to come off or be provided. However, the edge of the roof was visible prior to bid, so the Contractors knew what type of deck was existing. Therefore, they could determine the required materials for the system they were providing.
> . . .
> 5. DPW     The SOW states "Provide new PVC roof system on metal roof". Any materials required for the system should have been priced when the bid was submitted.

(Def. Ex. 71, Doc. 61-24.)

On December 17, 2015, Paula Tidwell, the Contracting Officer who had the authority to approve any request with respect to a change of work, replied to Meadows email: "Agree with Russell[] [Meadows'] assessment below in that the responsibility of this issue rests with the roofing contractor." (Def. Ex. 72, Doc. 61-25; Meadows Dep. 79:1–6, 89:22–25, Doc. 61-3.)

On December 15, 2015, Four Thirteen informed Meadows that Advantage agreed to withdraw its request for a change order. (Def. Ex. 71, Doc. 61-24; Meadows Dep. 90:10–91:3,

Doc. 61-3.)  Strawbridge admitted that Estill did not "allow this" change order and "threw it out."

(Strawbridge Dep. 196:22–197:14, Doc. 61-5.)

On January 4, 2016, Meadows approved and accepted the recommended installation to "fix" the problems from before. (Def. Ex. 48, Doc. 61-20; Meadows Dep. 97:8–24, Doc. 61-3; Estill Dep. 66:3–8, Doc. 61-4.)  Advantage's remedial work included removing the old foam in its entirety. (Advantage Dep. 94:3–6, Doc. 61-6.)  When the remedial work was performed, the Army issued a modification to replace some of the steel decking of the roof because it had rusted through. (Meadows Dep. 71:15–19, Doc. 61-3.)

### K.  The Issue of Whether the SOW and Specifications Required that All Foam Be Removed

One of the central issues in this case is whether the SOW and Specifications required that all foam be removed.  Both sides highlight different evidence or different parts of the same evidence.  The Court will now highlight some of the evidence on this issue, though some has been described above.

### 1. Central Roofing's Evidence

Central Roofing begins by pointing to the text of the SOW and Specifications. Again, the SOW provides:

Work shall include, but is not limited to, the following items: . . .

c. Replace roof system on Dyno Bldg 373. . . .

a) Remove existing foam roofing, EPDM roof system, and all other roofing from concrete deck roof to provide an acceptable surface for application of new roofing material. . . .

s) Install new PVC roof system on concrete roof. . . .

e. Repair leaking metal roof as shown.

a) Remove existing foam roofing for application of new roofing system.

b) Install new PVC roof system on metal roof.

(Def. Ex. 2, Doc. 61-8.)  The Specifications provide in the first paragraph (entitled "Scope") that "The project is to remove existing roofing and install PVC Roofing System complete, install Steel Sheet Roofing complete, and apply Acrylic Wall Coating." (Def. Ex. 3, Doc. 61-9.)

Again, Meadows was the primary author of the Specifications and SOW (Meadows Dep. 19:2–5, Doc. 61-3; *id.* 9:15, Doc. 71-2.)  He testified that the Specifications called for "All foam to be removed down to the substrate" and that that requirement did not change. (Meadows Dep. 31:3–9, Doc. 61-3 at 8.)   Further, Meadows said (in relevant part) in an email to Estill dated December 14, 2015:

> CO2 The SOW called for removal of existing foam roofing for the application of the new roofing system.  The intent, of the contract documents was to have all spray foam roofing removed for installation of the new system.  This was for several reasons: 1 the spray foam roofing is severely deteriorated. 2 the spray foam has allowed moisture to enter and be trapped between the foam and steel deck. 3 the deck needs to be looked at to verify there are no areas in need of replacement.  These were all concerns during the time of writing the SOW.

(Def. Ex. 43, Doc. 61-19.)  Meadows testified that these reasons were accurate at the time of bidding, accurate at the time he sent the email, and still accurate at the time of his deposition; "the scope of work called for the removal of existing foam roofing for the application of a new roofing system[.]" (Meadows Dep. 75:4–21, Doc. 61-3.)  Meadows also testified that, when he went out for the site visit,  he addressed the fact that, under the Specifications, all foam had to be removed down to the substrate. (Meadows Dep. 31:3–14, Doc. 61-3.)  Meadows stated: "The foam was in a poor condition.  Everybody saw it, okay? So it had to come off." (Meadows Dep. 86:2–3, Doc. 61-3 at 22.)   Meadows testified that the way Central Roofing performed (leaving the foam in

place) "failed to meet the requirements of [the Army's] scope of work." (Meadows Dep. 92:15–22, Doc. 61-3.)

Estill agreed that the SOW and Specifications "call[ed] for the removal of the foam on this roofing project." (Estill Dep. 16:11–15, Doc. 61-4 at 4; *see also id.* 45:10–13.) When asked what his position was "as to what should have been done on that metal roof with the ridges and the valleys", Estill testified, "I remember, they was . . . pretty plain, that the scope of work called for removing the insulation." (Estill Dep. 43:2–6, Doc. 61-4.) His interpretation of the SOW, "at this point" and "back then", was that "leaving in those valleys . . .as the general contractor would have been inconsistent with the [SOW]." (Estill Dep. 43:7–11, Doc. 61-4 at 11.) Estill later said that, prior to the work stopping, he believed that "they were supposed to remove all of the foam on top of the ridges and within the valleys from the beginning of the project[.] . . . [R]emoving the foam to the deck should be down to the deck." (Estill Dep. 75:1–18, Doc. 61-4 at 19.)

Central Roofing also points to Strawbridge's own testimony. Specifically, Strawbridge stated:

Q:    Let's talk about the foam on Buildings 2 and 3.  Is that foam supposed to have been removed in its entirety?

A:    **Under the initial thing that Meadows put in spec, it was;** but under our quote and stuff – because he had- Mr. Estill had quotes from other roofers, and they had quoted for just taking it down level.  So that's what we were asked to do, quote to match.
          So we quoted to take it down level with the – in other words, it's got a ridge, and we were supposed to even it up and leave the foam at the center.

Q:    Let's see if I can describe this.  The metal decking is – has ridges and valleys.

A:    Right.  It's, it's basically an R-panel roof, which means it's about 12 inches from rib to rib, and they're about an inch and a half tall.  And then you've got a flat area and then an inch and a half.

Q:      So your appreciation was that the foam would be taken down to the upper
        ridge –

A:      Right, to smooth it out.

Q:      And the foam would be  -- would remain in the valley.

A:      Right, we would. Right. That's correct.

(Strawbridge Dep. 150:19–151:17, Doc. 61-5 at 38 (emphasis added).)  Strawbridge later testified:

Q:      . . . Mr. Russell Meadows states, "The SOW . . . called for removal of
        existing foam roofing for the application of the new roofing system.  The
        intent of the contract documents was to have all spray-foam roofing
        removed for installation of the new system."
        True or false?

A:      **That's what it says.**
                 But the thing is, by specifications, you couldn't have done that
        without adding more insulation, like we ended up doing anyway, because
        you couldn't apply the roof that he had specced based on taking the foam
        off.

(Strawbridge Dep. 201:19–202:8, Doc. 61-5 at 51 (emphasis added).)  When asked to explain the

discrepancy between what Meadows said and what Advantage did, Strawbridge testified:

        Well, that's not what we did and that's not what it called for and that's not
what our contract called for.
        Our contract called for us to take the – level the foam down – and that's the
contract from 4/13 – put 1-inch insulation on top of it, with a half-inch Securock,
and put our roof on it.
        Now, if you had took the foam up, those specs would not work because you
got 12 inches in between that would be nothing under it.  And you would have to
have got a change order of some type to put in another layer of insulation – which
he didn't call for in his specs, didn't make any mention of it – to make the roof 2
inches thick instead of 1-inch.

(Strawbridge Dep. 202:20–203:11, Doc. 61-5 at 51.)  Explaining further, Strawbridge testified:

A:      Well, I didn't have my contract with Mr. Meadows.  I had it with Four
        Thirteen.

Q:      Right.  And so the problem, then, is between Four Thirteen and the Army and Mr. Meadows?

A:      Well, then it ain't my problem.

Q:      And it's also not Central Roofing's problem, then, is it?

[Objection to Form]

THE WITNESS:  It's their problem because they put the roof on incorrectly and it leaks.  It's their problem because they didn't put the roof on where it wouldn't leak.  If the roofing hadn't leaked, we wouldn't have had any problems, but it leaked.

Q:      Because they were told to stop working, get off the job.

[Objection to Form]

THE WITNESS:  That's a matter of opinion.

(Strawbridge Dep. 210:11–211:4, Doc. 61-5.)

Finally, Advantage testified through Strawbridge, its corporate representative:

Q:      Mr. Meadow's original scope of work said remove the foam roofing. Correct?

A:      But my contract was not with Mr. Meadows.

Q:      Answer my question though.  Does the scope –

A:      No—

Q:      Please.  The scope of work for the contract that the Army issued called for removing the foam roofing.  Correct?

[Objection to Form]

JAMES: It says that but it doesn't say--it doesn't say for which buildings and there's seven buildings out there.

(Advantage Dep. 92:17–93:2, Doc. 61-6.)

23

## 2. Advantage's Evidence

Advantage, on the other hand, claims that, "[i]nitially, RRAD agreed that the installation had not changed, and Central Roofing (or its sub) could remove foam to create a level surface for the placement of the new roofing materials." (Opposition, Doc. 71 at 5.)  In support of this, they point to the same meeting notes quoted above.  (Def. Ex. 69, Doc. 61-22.)  Advantage also point to the email from Estill to Meadows that lays out Advantage's six points. (Def. Ex. 70, Doc. 61-23.)  Advantage also refers to Meadows' response to Estill. (Def. Ex. 71, Doc. 61-24.)

Further, Advantage points to some of Strawbridge's testimony wherein he said of the October 14 meeting:

> You know, basically, they told us what they were expecting the problems were.  And Chris said that was his crew and that he would get the thing done; he was going to be on the jobsite. . . .
> Well, Chris told them he was going to be up there, going to be on the jobsite and get the roof straightened out, and he would be there the first of the week.
> Which never happened.  It ended up, they were working in Memphis, so they couldn't make it.  Same crew, Perez and them, were working up in Memphis on a project, so they didn't make it, didn't come back. . . .
> Russell is telling him that there's been no change in the installation.  On the 8th, he told him that he could either go ahead and start taking the insulation stuff off and start smoothing the roof out, or he could put in to dry, temporary, until we had the meeting.
> And so they decided they'd just temporarily seal it, and that's what they did.
> And that's why he's saying here they just rolled out the membrane to protect it from a rain event.  That is Russell Meadows saying that, and he's saying that on the 13th.

(Strawbridge Dep. 165:25–167:17, Doc. 61-5.)

In other testimony Advantage relies upon, Strawbridge stated that, between October 8 and October 23, Meadows did not authorize Central Roofing to come back on the job because there was no decision about what work there were supposed to do; "In other words, we couldn't proceed

until we got some kind of directive to which roof to put on." (Strawbridge Dep. 178:1–17, Doc.

61-5.) Strawbridge continued:

A:     And we still, at this particular point, did not have any explanation on – from Russell Meadows on which direction to take.  We were still waiting, it was just after all the water and damages and stuff had happened that it became apparent the whole roof was going to have to come off.

Q:     When you say it became apparent the whole roof was going to have to come off—

A:     From the rains that occurred during the 23rd and 24th, because water got up underneath the foam and everything that was under the old roof, underneath the new roof, the insulation.  And the DensDeck and Securock was down, and it was soaked all them, so the whole thing had to come off.

Q:     You're talking about Building 2 and Building 3?

A:     Uh-huh.

Q:     Yes?

A:     Yes.

(Strawbridge Dep. 179:2–21, Doc. 61-5.)

Plaintiff argues from this testimony that "the parties had agreed after work stopped that the foam filler would remain on the roof, which decision only changed after the late October rain storms damaged the materials and wet the foam." (Opposition, Doc. 71 at 10.)

Advantage also points to three documents purporting to show that, up until October 22, 2015, proposals were still being considered that allowed for the existing roofing material to stay in place.  (Opposition, Doc. 71 at 9.)  One proposal dated October 20, 2015, by Carlisle stated, "2. Existing roofing material left in place after contractor review following good roofing practices. 3. 1-inch thick Carlisle Polyisocyanurate insulation installed over the existing roofing material." (Pl. Ex. CC, Doc. 71-27.)  This was sent by Strawbridge to Meadows on the same day. (Pl. Ex. DD,

Doc. 71-28.) On October 21, 2015, Meadows indicated that the proposal did not satisfy the SOW with respect to the warranty's wind speeds. Then, on October 22, 2015, Carlisle sent RSG another proposal that had the same language about leaving the existing roof material in place, as quoted above. (Pl. Ex. EE, Doc. 71-29.)

Advantage also points to other documents. Notes from the November 18, 2015 meeting state, "Discussed that what was seen on the roof on 11/11/2015 was not what the scope called for. *In the meeting it was conveyed that in the SOW it states that all the old foam roofing comes off down to the highs of the R panels.* It was determined that this issue should be between Advantage Roofing and 413." (Def. Ex. 69, Doc. 61-22.) Advantage also points to Estill's six-point email, wherein he stated that the SOW only said "to remove enough 'for application of new roofing' " and that "DPW initially agreed to the partial removal approach." (Def. Ex. 70, Doc. 61-23.) Lastly, Meadow's response to Estill's six-point letter includes the following: "DPW did offer to allow the foam in the flute to remain, provided it was not holding moisture underneath and was in an acceptable condition for overlay of the new iso board." (Def. Ex. 71, Doc. 61-24.)

Lastly, Advantage Roofing points to certain alleged admissions with respect to Central Roofing's insurance claim. Creely testified that his insurer agreed to "pay for the materials and for the demo of the roof." (Central Roofing and Creely Dep. 59:6–12, Doc. 61-7.) Creely specifically testified:

> Q: Can you describe for me generally the process for submitting your insurance claim and what happened with that claim?
>
> A: I called my agent and within a week or two I met the guy out at the building, and then there was – they basically agreed to pay for the materials and for the demo of the roof.

(Central Roofing and Creely Dep. 59:6–12, Doc. 61-7.) Creely said further about his claim:

Q:      All right.  Did you speak with either of them or both of them about this claim?

A:      I don't know.

Q:      And of course you've spoke with Jimmy?

A:      Yeah. I've spoken with all three of them at some point.

Q:      So you're saying that you told one of the representatives of Advantage Roofing that you intended to purchase the materials, demo the roof that Colonial had put on, and reinstall the roof on buildings 2 and 3?

A:      I did.

Q:      At what point did you tell them that you were not going to do that?

A:      They told me I was not going to do that.  Jimmy Strawbridge told me I was not going to do that.

Q:      What was your response?

A:      "What?" basically was my response.  And then that's when he said that his bonding company told him that he had to use his own employees and he couldn't use anybody else and he wanted me just to send him the money. And that's when I said to myself, well, you owe me all this other money, no, I'm not sending you any money.  And I told my insurance company that I wasn't sending him the money.

(Central Roofing and Creely Dep. 113:3–114:4, Doc. 61-7.)

Advantage also submits the report of the adjuster for Central Roofing's insurer. (Pl. Ex. BB, Doc. 71-26.)  The "**Cause of Loss:**" section of that report states:

The insured was subcontracted by Advantage Roofing of Ruston, LA, to install a PVC membrane roofing atop Building #373, on the Red River Depot in Hooks, TX. This building is a cluster of several buildings including pitched metal and low slope metal roofing.  During the installation process, two sections of the roofing were improperly installed, allowing water to penetrate the roofing system, resulting in damage to the roofing.

(Pl. Ex. BB, Doc. 71-26 at 2.)  Creely testified that he agreed with the statements in the "**Cause of Loss:**" paragraph. (Central Roofing and Creely Dep. 157:10–13, Doc. 61-7.)

This document also contains a section entitled "**Interview of Insured: Chris Creely, Insured**". (Pl. Ex. BB, Doc. 71-26 at 2.)  This section stated, "Although the job is ongoing, the subcontract labor from [Colonial] Roofing, under supervision of the insured, improperly installed the PVC 60 mil membrane around the ridge fence, allowing water to penetrate the entire roofing system." (Pl. Ex. BB, Doc. 71-26 at 2.)  Creely testified about the correctness of this statement: "Well, they didn't finish it.  I don't think 'improperly installed' would be the correct words." (Central Roofing and Creely Dep. 159:1–8, Doc. 61-7.)   The interview section also stated later, "The insured indicated that they [(i.e., Colonial)] did not properly install the termination bars around the ridge vents, allowing water to penetrate." (Pl. Ex. BB, Doc. 71-26 at 2.)  Regarding this statement, Creely testified that it was correct "[b]ecause we weren't allowed to." (Central Roofing and Creely Dep. 160:6–10, Doc. 61-7.)   The interview section next said, "There was also a section of the roof which was leaking which is the lower pitched area, as the roof to wall transition was not properly installed, leaving a gap behind the membrane which allowed interior water penetration." (Pl. Ex. BB, Doc. 71-26 at 2.)  Creely testified that this sentence was correct "because it wasn't finished." (Central Roofing and Creely Dep. 160:11–17, Doc. 61-7.)   The interview section closed with the following:

> The insured filed the claim for damages, as he is required by the Army Corp of Engineers to tear off all new roofing materials and dispose of them properly and to reinstall the entire roofing system per the job specifications which is estimated at approximately $130,000.00.  The insured also indicated that there maybe [(sic)] interior water damage in the buildings as well.

(Pl. Ex. BB, Doc. 71-26 at 2.)  Creely testified that this was his understanding of what needed to be done: "Tear off all new roofing materials, dispose of them properly, and reinstall the entire

roofing system per the job specifications[.]" (Central Roofing and Creely Dep. 161:7–12, Doc. 61-7.)

Advantage also points to certain deposition testimony from Creely in which he stated that, as of January 13, 2016, he had finished providing information to his insurer regarding his insurance claim and knew his claim would be paid. (Central Roofing and Creely Dep. 168:13–20, Doc. 61-7.)  Yet, despite this, Creely sent an email to Strawbridge in February 2016 saying that the insurer would need invoices, even though the insurer had not submitted a request for additional information. (Central Roofing and Creely Dep. 168:21–171:12, Doc. 61-7.)

Advantage lastly refers to the fact that Central Roofing claimed an "offset" amount for the amount of money paid to it by its insurer:

> Q:    With respect to the $68,000 that was paid for materials, did [Central Roofing] ever purchase any materials?
>
> A:    No.
>
> Q:    In your accounting in any way for [Central Roofing] was Advantage given any kind of credit for those payments?
>
> A:    I exercised my right of offset on the money that they owed me on the Red River Office Depot and the State Office Building.
>
> Q:    And was that exercised with respect to the full approximately $82,000?
>
> A:    Yes.
>
> Q:    And so it is your understanding that they now owe you $82,000 less by virtue of that offset?
>
> A:    Yes.

(Central Roofing and Creely Dep. 63:7–23, Doc. 61-7.)

## L.  Advantage's Damages

Concerning Advantage's damages, Strawbridge testified:

"I'm out actual money because I haven't received anything. I've had to go back and take the roof off. I've already paid for the material one time, had to buy the material again. He collected the money from my insurance company. I didn't get that money.

So I paid for the roof materials twice. I've paid for taking the roof off, for extra, and then putting the roof back on. Now, where in the world have I benefited from them?

(Strawbridge Dep. 243:3–11, Doc. 61-5.)

Advantage also points to a June 16, 2016, letter from its investigator that broke down its alleged damages incurred through 6/15/2016 substantial completion. (Strawbridge Dep. 248:7–249:13, 253:23–254:1, Doc. 61-5; Def. Ex. 26, Doc. 61-16.) Advantage claimed about $123,000 for the "[u]pper roof" of Building 3 and about $88,000 for the "lower roof[]" of Building 2. (*See* Def. Ex. 26, Doc. 61-16; Strawbridge Dep. 253:23–254:7, Doc. 61-5.) $98,000 was listed as "Additional cost." (Def. Ex. 26, Doc. 61-16.) Strawbridge stated that the $123,000 was "the materials and stuff to replace, and the equipment and stuff like that. . . . And I guess the 87 and 98 is actually what it cost, which would have been to do it with the new deal, 87 and – which would have been 15 and – yeah, 195,000 together." (Strawbridge Dep. 258:5–16, Doc. 61-5.) Strawbridge claimed that the $98,000 was "going to be interest and stuff over a period of time, because from the time the job was shut down 10th and 8th, to the time we got back to start, I was still paying $565 a day." (Strawbridge Dep. 261:21–262:1, Doc. 61-5.)

## II.    Relevant Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  [T]he nonmoving party must come forward with 'specific facts showing that there is a

genuine issue for trial.' " *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S. Ct. 1348 (1986) (internal citations omitted). The non-mover's burden is not satisfied by "conclusory allegations, by unsubstantiated assertions, or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations and internal quotations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. Further:

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion.

*International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991).

### III.    Discussion

#### A.  Parties' Arguments

##### 1. Defendant's Original Motion (Doc. 61) and Memorandum in Support (Doc. 61-2)

Central Roofing's argument boils down to the following: (1) "the Statement of Work ("SOW") and Specifications for the Project called for the removal of the old foam on the roof at issue;" (2) "that Advantage directed that the old foam remain in place contrary to the SOW and Specification;" and (3) "that all damages were the result of the need to remove old foam to comply with the SOW and Specification." (Doc. 61 at 1.)  Central Roofing maintains that, as a result of these three facts, Advantage Roofing's claims against it should be dismissed as a matter of law.

Elaborating, Central Roofing argues that the "issues with the project arose from Advantage Roofing's failure to follow the specifications for the project issued by the [Army], not from any alleged breach by Central Roofing."   Specifically, Central Roofing argues that the original Project

called for the removal of all foam from the roof. Despite this, Advantage submitted a bid to the general contractor which called for leaving the old foam in place. Advantage also instructed Central Roofing to leave the old foam in place. Advantage later submitted a project order to remove the foam, but the Army denied the request for additional money because foam removal was in the original Specifications and SOW.

According to Central Roofing, Advantage is essentially arguing that its bid changed the SOW and Specifications issued by the Army, but Central Roofing claims this is wrong as a matter of law. All Army contracts must be in writing, and the SOW and Specs were never amended to comply with Advantage's bid. Thus, Advantage's leaving the foam on was in breach of the SOW and Specs.

Central Roofing further argues that it is not liable to damages because:

> Damages in this case occurred when the old foam (and all materials installed on top of the old foam) had to be removed in order to comply with the SOW and Specifications. As set forth above, it is undisputed that Strawbridge instructed Central Roofing to leave the old foam in place. Thus, Advantage cannot show that any purported breach by Central Roofing caused damages to Advantage.

(Doc. 61-2 at 11.) While Advantage claims that Central Roofing breached the contract in "a constantly increasing number of ways," none of these alleged breaches caused Advantage damages:

> None of these alleged acts caused damage to Advantage because the need to remove the old foam as required by the SOW and Specifications meant that all the work performed by Central Roofing had to be removed and redone to comply with the SOW and Specifications. The gypsum board installed, whether DensDeck or Securock, had be to removed in order to remove the old foam. Even if the gypsum board was not attached correctly, the gypsum board had to be removed and replaced to remove the old foam. Even if the old foam was not leveled sufficiently, the old foam had to be removed. Even if Central Roofing did not make the roof watertight, there was no loss because everything that got wet had to come off and be replaced in any event.

(Doc. 61-2 at 11–12.)  As to Advantage's alleged inability to reuse the gypsum board, (1) Central

Roofing followed Advantage's direction; (2) Strawbridge admitted that he obtained replacement

gympsum at no charge; and (3) in any event, the total cost of the gypsum at issue is approximately

$3,000.

> Central Roofing concludes:
>
> The case comes down to the fact that Advantage's bid to perform the work
> submitted to Four Thirteen failed to comply with the Army's SOW and
> Specifications. The issue is between Advantage and Four Thirteen. . . .
>
> All of Advantage's purported claims against Central Roofing pertaining to the
> RRAD project should be dismissed by summary judgment. The undisputed material
> facts show that the SOW and Specifications for the Project called for removal of
> the old foam; Advantage directed that the old foam remain in place contrary to the
> SOW and Specifications; and all damages were the result of the need to remove old
> foam to comply with the SOW and Specification. All claims asserted by Advantage
> against Central Roofing should be dismissed with prejudice at Advantage's cost.

(Doc 61-2 at 12–13.)

## 2. Advantage's Opposition (Doc. 71)

> Advantage responds:
>
> Central Roofing's motion is based, in part, on the premise that Advantage breached
> a contract with the Army; however, Advantage did not have a contract with the
> Army. Central Roofing's argument is a non-sequitur. Central Roofing concludes
> that Advantage's alleged breach of a contract *that does not exist* renders Central
> Roofing's conduct meaningless in the contract that actually existed between Central
> Roofing and Advantage.

(Doc. 71 at 7.)  Advantage's contract was with Four Thirteen.

Advantage also argues that Central Roofing admitted to its insurer that Colonial Roofing

improperly installed materials and that Central Roofing ignores the fact that Advantage had to pay

for materials twice. Further, Central Roofing admitted that damages were sustained because the

Project was stopped before the roof was watertight, yet neither Central Roofing nor Colonial took

steps to make the roof waterproof.  Further, Central Roofing knew that its instructions to Colonial Roofing to put ballasts over the membrane would not make the roof watertight yet it did so anyway.

Advantage also argues that there is a question of fact as to whether it was required to remove all of the foam.   Advantage claims that it was not until the rains came in October 23-27, 2015 "that the plan to leave the foam in place was shelved." (Doc. 71 at 9.)  Advantage points to certain project notes and emails that evidence an agreement to only remove part of the foam.

In sum, Advantage argues:

> Central Roofing's motion for summary judgment should be denied. Central Roofing's motion is based on a premise that Advantage contracted with the Army when it clearly did not. It is also based on Advantage being required to remove all foam on the roofs when the evidence shows that Russell Meadows agreed to allow the foam to remain in the flutes of the metal roof. Moreover, Central Roofing's admissions to its insurer that it was responsible for damages to the project, and its admissions that it failed to watertight the building, which it admits damaged Advantage create a genuine issue of material fact that requires denial of its motion.

(Doc. 71 at 10.)

### 3. Central Roofing's Reply (Doc. 72)

Central Roofing replies that, contrary to Advantage's arguments, it is undisputed that the Specifications and SOW required removal of all foam, and even Advantage's principle admits this. Without any written amendment, the Specifications and SOW control.  Central Roofing further argues that there was no discussion about leaving the foam in place until after the work stopped in October 8, 2015.   Central Roofing also asserts that Advantage admitted that it directed Central Roofing to level the foam (i.e., leave it in place).   Central Roofing maintains that, contrary to Advantage's briefing, the Army was never willing to leave the old foam in place before the rains came.   Central reiterates that there was a disconnect between the Specifications/SOW and Advantage's contract with Four Thirteen, but, as the Army noted, that was one between Advantage and Four Thirteen.  "Because Advantage directed Central Roofing to perform work contrary to the

SOW and Specifications, all of the work had to be redone. Thus, Advantage cannot show that any purported breach by Central Roofing caused damages to Advantage".  Central concludes:

> The fact is that the SOW and Specifications required all of the old foam to be removed, as admitted even by Strawbridge himself. The second fact is that Advantage directed Central Roofing to leave the old foam in place, contrary to the SOW and Specifications. The third fact is that the Army required all work . . . to be redone to remove the old foam as required by the SOW and Specifications. Thus, Advantage cannot show that any purported breach by Central Roofing caused damages to Advantage.

(Doc. 72 at 4.)

### B.  Applicable Law

Article 1994 of the Louisiana Civil Code provides that "[a]n obligor is liable for the *damages caused by* his failure to perform a conventional obligation." La. Civ. Code art. 1994 (emphasis added).  Thus, "[t]o succeed on a breach of contract claim, the plaintiff must prove (1) the obligor undertook an obligation to perform; (2) the obligor failed to perform the obligation (the breach); and (3) the obligor's failure to perform resulted in damages to the obligee." *Cent. Facilities Operating Co. v. Cinemark USA, Inc.*, 36 F. Supp. 3d 700, 712 (M.D. La. 2014) (citing *Favrot v. Favrot*, 2010-0986 (La. App. 4 Cir. 2/9/11); 68 So. 3d 1099, 1108–09).

Also relevant, Louisiana Civil Code Article 2315 provides: "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." La. Civ. Code art. 2315.  "The duty-risk analysis is the standard negligence analysis employed in determining whether to impose liability under [Article] 2315." *Lemann v. Essen Lane Daiquiris, Inc.*, 2005-1095 (La. 3/10/06); 923 So. 2d 627, 632–33 (citing *Mathieu v. Imperial Toy Corp.*, 94-0952 (La. 11/30/94); 646 So. 2d. 318, 321).  Under this analysis, a plaintiff must prove five separate elements:

> (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant's conduct failed to conform to the appropriate standard

(the breach element); (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries (the cause-in-fact element); *(4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) the actual damages (the damages element).*

*Id.* at 633 (emphasis added) (citing *Fowler v. Roberts*, 556 So. 2d 1, 4 (La. 1989)*, reh'g granted on other grounds and original opinion reinstated as supplemented,* 556 So. 2d at 13 (La. 1990)).

"A negative answer to any of the inquiries of the duty-risk analysis results in a determination of no liability." *Id.* (citing *Mathieu*, 646 So. 2d at 326).

Further: "Generally, a contract with the federal government must meet the following requirements: 'mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government.' " *See Northeast Constr., Inc. v. United States*, 119 Fed. Cl. 596, 612 (2015) (quoting *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1326 (Fed. Cir. 1997)). However, contracts with the Army must be in writing. *See id.* at 613. Specifically, as the *Northeast Construction* court explained:

"A written award or acceptance of proposal mailed or otherwise furnished to the successful offeror within the time specified in the proposal shall result in a binding contract without further action by either party." AR 127 (incorporating FAR 52.215–1(f)(10)). The other provision sets forth a prerequisite to the existence of a binding contract: "This contract is subject to the written approval of U.S. Army Contracting Command—Aberdeen Proving Ground (ACC–APG) and shall not be binding until so approved." *Id.* at 142 (incorporating FAR 52.204–1). These two solicitation provisions demonstrate that a written agreement was necessary to have a binding contract. In addition, various statutes and regulations pertaining to government procurements indicate that a procurement contract must be in writing to bind the parties. *See* 10 U.S.C. § 2305(b)(4)(C) (2012) ( "The head of the agency shall award the contract by transmitting, in writing or by electronic means, notice of the award to such source...."); FAR 2.101 (" 'Contract' means a mutually binding legal relationship.... It includes all types of commitments that obligate the Government to an expenditure of appropriated funds and that, except as otherwise authorized, are in writing."); FAR 15.504 ("The contracting officer shall award a contract to the successful offeror by furnishing the executed contract or other notice of the award to that offeror."); *see also* 31 U.S.C. § 1501(a)(1)(A) (2012) ( "An amount shall be recorded as an obligation of the United States Government only when supported by documentary evidence of a binding agreement between an

agency and another person ... that is in writing, in a way and form, and for a purpose authorized by law[.]").

*Id.* Advantage raised no dispute on this point, so it is considered conceded for purposes of this motion. *See JMCB, LLC v. Bd. of Commerce & Indus.*, 336 F. Supp. 3d 620, 634 (M.D. La. 2018) ("The Fifth Circuit makes it clear that when a party does not address an issue in his brief to the district court, that failure constitutes a waiver on appeal. . . . By analogy, failure to brief an argument in the district court waives that argument in that court." (citations and quotations omitted)).

### C. Analysis

#### 1. Central Roofing is Entitled to Partial Summary Judgment on Most of Advantage's Claims

The Court finds no question of fact on the three key issues highlighted by Central Roofing. First, the SOW clearly and unambiguously provides, "Remove existing foam roofing". (Def. Ex. 2, Doc. 61-8.) The Specifications similarly provide in the Scope: "This project is to remove existing roofing and install PVC Roofing System complete, install Steel Sheet Roofing complete, and apply Acrylic Wall Coating." (Def. Ex. 3, Doc. 61-9.) "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ. Code art. 2046. Thus, the plain language of these documents controls.

Even if there were ambiguity, the evidence demonstrates that the SOW required the removal of all foam. Meadows, who drafted the above documents (Meadows Dep. 9:15, 19:2–5, Doc. 61-3), stated in his deposition and in documentary evidence that all foam had to be removed. (Def. Ex. 43, Doc. 61-19; Meadows Dep. 31:3–9, 75:4–21, Doc. 61-3.) The notes from the November meeting confirm this as well (Def. Ex. 69, Doc. 61-22 ("[the Army] felt like the roofers

did not pull off the old foam roof as per the SOW.")), as does Meadows' December 14, 2015 response for additional funds (Def. Ex. 43, Doc. 61-19 ("The SOW called for removal of existing foam roofing for the application of the new roofing system.")).  Critically, it is undisputed that this was the Army's position at the October 14, 2015, meeting, *before* the rains came.  (Meadows Dep. 39:2–22, 64:7–22, 177:5–23, Doc. 61-3.)   Further, Estill and Creely agreed with this. (Estill Dep. 16:11–15, 43:2–6, 43:7–11, 45:10–13, 53:18–25, 75:1–18, Doc. 61-4; Central Roofing and Creely Dep. 40:23–41:16, Doc. 61-7.)   Even Strawbridge admitted that, according to the SOW and Specifications, the foam was supposed to be removed in its entirety. (Strawbridge Dep. 150:19– 23, 201:19–202:3, Doc. 61-5.)  Advantage similarly admitted in its corporate deposition that the SOW called for removal of the foam. (Advantage Dep. 92:17–93:2, Doc. 61-6.)

Second, there is no question of fact that Advantage directed Central Roofing to level the foam rather than remove it.  Strawbridge testified to this fact several times in his deposition (Strawbridge Dep. 154:10–156:5, Doc. 61-5), and Advantage stated at its corporate deposition that Strawbridge "told Chris Creely with Central Roofing to have his crews level the foam as much as possible and install the new roofing material over the old foam." (Advantage Dep. 89:19–23, Doc. 61-6.)  All of this testimony was consistent with Creely, who said that his work on Buildings 2 and 3 was "[b]asically . . . to level out the foam roof that was there and then install a cover board and TPO membrane." (Central Roofing and Creely Dep. 21:14–22, 22:18–22, Doc. 61-7.)

And third, and perhaps most importantly, there is no dispute that all of Central Roofing's work had to be redone because Central Roofing (at Advantage's direction) did not remove the foam.  Meadows testified that, at the October 14, 2015 meeting—again, *before* the flood—the government "reiterated to them that it had to be taken down to the deck, meaning everything off the deck" so that they could see if the roof was "rusted through and then go back with it."

(Meadows Dep. 39:2–22, Doc. 61-3.) Again, Meadows anticipated that, going forward, the roofing system that had been installed would be removed and that the spray foam would be "removed completely down to the steel deck as proposed originally"; that is, "everything that was there, as of that point in [Meadow's] mind, needed to come off and be put back on as per specifications[.]" (Meadows Dep. 64:7–22, Doc. 61-3.)  Meadows also testified that, because material was lost because it got wet and because it was installed incorrectly, the Government was going to allow them to reuse what they could if it was good structurally. (Meadows Dep. 66:19–68:4, Doc. 61-3.)[6]  But, as Meadows testified, "all that had to come off in any event[.]" (Meadows Dep. 67:3–4, Doc. 61-3.)  Meadows testified that he realized during the roof inspection that they had not removed all of the foam and that, from that point forward, he told Estill that they needed "to take it down, completely removed and start over." (Meadows Dep. 47:20–24, Doc. 61-3.) Again: "the government stance [at the October 14, 2015, meeting] was that building No. 3 and building No. 2 need to be completely removed, all the roofing that was put on and brought back to the state of what was mentioned, what was required by the scope," and Meadows relayed that during the meeting. (Meadows Dep. 177:5–23, Doc. 61-3.)  Creely confirmed Meadows' account. (Central Roofing and Creely Dep. 40:23–41:16, Doc. 61-7.)

As will be discussed below, Advantage fails to create an issue of fact on any of these three issues.  Consequently, because Advantage has largely failed to demonstrate a question of fact on these three issues, Central Roofing is entitled to summary judgment, except as narrowly described below.

---

[6] As will be explained below, drawing reasonable inferences in Advantage's favor, this is the key fact precluding total summary judgment on the issue of the materials.

### 2. Advantage Has Largely Failed to Create a Question of Fact Precluding Summary Judgment

Advantage makes several arguments to attempt to create issues of material fact. The Court, however, rejects each of them.

#### a. The SOW and Specifications Were Not Amended in Writing

First, even Meadows concedes that there were discussions about keeping the foam in place, but, as Central Roofing argues, all of these claims—including the emails of such discussions (Pl. Exs. CC, DD, & EE) and Strawbridge's alleged testimony that such an agreement existed (Strawbridge Dep. 179:2–21, Doc. 61-5.)—are irrelevant because there was no written agreement amending the SOW. (Meadows Dep. 84:11–85:6, Doc. 61-3.) Because all contracts with the Army must be in writing, *Northeast Constr.*, 119 Fed. Cl. at 613, all of Advantage's evidence fails to create a question of fact.

#### b. Central Roofing's Alleged Admissions Do Not Preclude Summary Judgment

Second, Central Roofing's alleged admissions also do not create questions of fact. Central Roofing conceded that the following statement in Advantage's Petition was "substantially correct": "Upon information and belief, at the time the work halted, the roof assembly was not water-tight, as it would have been if the roof was in a finished stage. If the work had not been stopped, the project would have been completed on or about October 10, 2015." (Doc. 1-2 at 5; Doc. 9 at 5.) But (1) Central Roofing stated (albeit inartfully) that it was not responsible for the "lack of a water tight roof", and (2) even if it were, this does not change the fact that all of the work had to be redone for Central Roofing's failure to follow the SOW and Specifications (at Advantage's direction).

Similarly, Central Roofing's alleged "admissions" in their affirmative defenses also do not preclude summary judgment.[7] A judicial admission is 'a formal concession in the pleadings or stipulations by a party or counsel that is binding on the party making [it].' " *United States v. Chavez-Hernandez*, 671 F.3d 494, 501 (5th Cir. 2012) (quoting *Martinez v. Bally's Louisiana, Inc.*, 244 F.3d 474, 476 (5th Cir. 2001)).

"By contrast, an ordinary evidentiary admission is 'merely a statement of assertion or concession made for some independent purpose,' and it may be controverted or explained by the party who made it." *Martinez*, 244 F.3d at 476–77 (quoting *McNamara v. Miller*, 269 F.2d 511, 515 (D.C.Cir. 1959)). " 'A judicial admission is conclusive, unless the court allows it to be withdrawn; ordinary evidentiary admissions, in contrast, may be controverted or explained by the party.' " *Id.* at 477 (quoting *Keller v. United States*, 58 F.3d 1194, 1199 n. 8 (7th Cir. 1995) (quoting John William Strong, *McCormick on Evidence*, § 254 at 142 (1992))).

Thus, in *Martinez*, the Fifth Circuit found no error in the district court's conclusion that a plaintiff's counsel's statements in a deposition that she was "not making any kind of physical injury claims" were a judicial admission "which could not be contradicted by affidavit or otherwise" because they "were intended to relieve [defendant] from discovery of facts related to physical injury and were not merely asserted for an independent purpose." *Id.* at 476–477. The

---

[7] Again, Central Roofing asserted the following two affirmative defenses:

> Any damages sustained by the plaintiff occurred because RRAD engineers and/or Four Thirteen, Inc. and/or the plaintiff decided to shut down the project on October 8, 2015 when the roof was not water-tight.
> . . .
> To the extent that the plaintiff suffered any damages, the damages were due to the fact that the building was left exposed to the weather when the roof was not water-tight for an extended and unreasonable period of time. The act of leaving the building exposed to the weather when the roof was not water-tight was not attributable to Central Roofing in any manner.

(Doc. 9 at 3.)

Fifth Circuit also noted that defendant deposed five of Plaintiff's medical providers, and none were seen for physical injuries. *Id.* at 477.

Conversely, in *Chavez-Hernandez*, the Fifth Circuit found that the defendant's counsel's concession during a sentencing that the defendant's victim was fourteen years old was not a judicial admission, though it was an evidentiary admission for purposes of applying a sentencing enhancement. *Chavez-Hernandez*, 671 F.3d at 500–01.

"[F]or a statement of counsel to qualify as a judicial admission 'it must be made intentionally as a waiver, releasing the opponent from proof of fact.' " *Id.* at 501 (quoting *Martinez*, 244 F.3d at 476); *see also In re Corland Corp.*, 967 F.2d 1069, 1074 (5th Cir. 1992) ( "[O]nly 'deliberate, clear and unequivocal' statements can constitute conclusive judicial admissions.").

" 'Judicial admissions . . . typically concern only matters of fact." *Blankenship v. Buenger*, 653 F. App'x 330, 336 n. 15 (5th Cir. 2016) (quoting *MacDonald v. Gen. Motors Corp.*, 110 F.3d 337, 341 (6th Cir. 1997)). "The scope of judicial admissions is restricted to matters of fact which otherwise would require evidentiary proof, and does not include counsel's statement of his conception of the legal theory of a case."). *Id.* (quoting *Glick v. White Motor Co.*, 458 F.2d 1287, 1291 (3d Cir. 1972)); *see also Boyte v. Lionhead Holdings*, No. 10-1467, 2012 WL 2680022, at *4 (N.D. Tex. July 6, 2012) (" 'Judicial admissions generally [ ] are restricted to matters of fact which otherwise would require evidentiary proof, and therefore, do not include legal theories or conclusions[.]' " (quoting *Kiln Underwriting Ltd. v. Jesuit High Sch. of New Orleans*, 2008 WL 3365520, at *5 n. 2 (E.D. La. Aug. 8, 2008))).

Here, the Court finds that Central Roofing's affirmative defenses are not judicial admissions because (1) the statements in the affirmative defenses constitute legal theories, not facts, and (2) to the extent the affirmative defenses are facts, they do not constitute a clear and

unequivocal waiver. The affirmative defenses are also not evidentiary admissions because (1) Central Roofing does not concede that Central Roofing sustained any damages (*See* Doc. 9 at 3 ("*Any* damage sustained by plaintiff occurred because . . . *To the extent that the plaintiff suffered any damages*. . ." (emphasis added)), and (2) Central Roofing certainly does not admit that it was the cause of any such hypothetical damages.

### c. Documentary Evidence, When Read in Context, Does Not Create a Question of Fact

Advantage also misconstrues certain documentary evidence in its argument. For example, the November 2015 meeting notes do not create a question of fact. Advantage seizes on the statement, "In the meeting it was conveyed that in the SOW it states that all the old foam roofing comes off down to the highs of the R panels." (Def. Ex. 69, Doc. 61-22.) This isolated statement, made in the passive voice, does not convey who said this. But, even more importantly, this statement needs to be seen in context:

> Had a meeting with Depot, 413, Central Roofing and Advantage Roofing. **Discussed what was seen on the roof on 11/11/2015 was not what the scope called for.** In the meeting it was conveyed that in the SOW it states that all the old foam roofing comes off down to the highs of the R panels. It was determined that this issue should be between Advantage Roofing and 413. We were told that it would be taking care of by 413. **All subs and 413 met in a separate meeting to talk specifics of their contracts but that they all agreed our contract stated that foam should be removed.** Then we talked about the building up of the roof vents. 413 will keep up with a total amount of wood and labor and supply it to us for that work.

(Def. Ex. 69, Doc. 61-22 (emphasis added); *see also* Meadows Dep. 70:6–71:25, Doc. 61-3.) Thus, the entire quote clearly establishes that "all agreed our contract stated that foam should be removed," and a reasonable juror could not conclude otherwise.

The same reasoning applies to Meadow's December 16, 2015 response to Estill's six-point argument for a change order. Advantage cherry-picks the following from this letter: "DPW did

offer to allow the foam in the flute to remain, provided it was not holding moisture underneath and was in an acceptable condition for overlay of the new iso board." (Def. Ex. 71, Doc. 61-24.)  But no reasonable juror could accept Advantage's interpretation in light of other parts of the letter:

> [The SOW] says "Remove existing foam roofing for application of new roofing system".  It does not say some of the foam, or just enough for a smooth surface. These are roofers that have installed different types of roofs. They know how a foam roof is installed and the difficulty of removing the foam.

(Def. Ex. 71, Doc. 61-24.)  And, again, an "offer" to allow the foam to remain in place does not constitute a binding contract made in writing.  Without more, Advantage's arguments about these documents fails.

### d. Central Roofing's Insurance Claim Do Not Create a Question of Fact

Central Roofing's insurance claim also does not preclude summary judgment.  The fact that Advantage received money as part of a claim does not mean Advantage is entitled to it. Presumably, this does not mean that Central Roofing will keep the money; that issue is ultimately between Central Roofing and its insurer.

Further, Central Roofing's apparent misleading of Advantage, while not commendable, also does not mean that Advantage is entitled to relief.  Similarly, Creely's claiming of an offset, while questionable self-help, also fails to create a question of fact.

Additionally, the report from Central Roofing's insurer also does not preclude summary judgment.  Creely admitted that the following was correct: "During the installation process, two sections of the roofing were improperly installed, allowing water to penetrate the roofing system, resulting in damage to the roofing." (Pl. Ex. BB, Doc. 71-26 at 2; Central Roofing and Creely Dep. 157:10–13, Doc. 61-7.)  As explained elsewhere in the opinion, Advantage has demonstrated a question of fact concerning reimbursement for damage to the materials on the roof, but this does

not change the undisputed fact that all of Central Roofing's work had to be replaced because it was not in compliance with the specs. The same can be said of the interview section (Pl. Ex. BB, Doc. 71-26 at 2); the fact that water caused damage to the roof because of improper installation, even if true, does not mean that Advantage is entitled to damages for replacing a roof that was installed incorrectly in the first place.

### e. Strawbridge Does Not Create a Question of Fact

Lastly, Strawbridge's testimony on damages does not preclude summary judgment. Most of it is conclusory and speculative; he appears to throw out numbers without providing a basis for any of them. (*See* Strawbridge Dep. 248–262.) As to specifics, he states:

> "I'm out actual money because I haven't received anything. I've had to go back and take the roof off. I've already paid for the material one time,. Had to buy the material again. He collected the money from my insurance company. I didn't get that money.
>
> So I paid for the roof materials twice. I've paid for taking the roof off, for extra, and then putting the roof back on. Now, where in the world have I benefited from them?

(Strawbridge Dep. 243:3–11, Doc. 61-5.) As demonstrated *infra*, Advantage has demonstrated a question of fact about damages for replacing the materials. (*See* Meadows Dep. 66:19–68:4, Doc. 61-3.) But, because there is no question that all of Central Roofing's work had to be replaced for failure to follow the SOW and Specifications (at Advantage's direction), Advantage has not shown, as a matter of law, that Central Roofing caused Advantage damages for having "to go back and take the roof off, for extra, and then putting the roof back on" and from Central Roofing's "collect[ing] . . . money from [Advantage's] insurance company."

For this and all the above reasons, Central Roofing is entitled to partial summary judgment. As a matter of law, Advantage has failed to demonstrate any question of fact that most of its

damages were caused by Central Roofing. Consequently, most of Advantage's damage claims will be dismissed with prejudice.

### 3. Narrow Exception to the Granting of Summary Judgment

While the Court grants summary judgment on most of Advantage's damage claim on the issue of causation, the narrow exception is Advantage's claim for the materials lost from water damage. A reasonable jury could conclude from the above facts (particularly those in Section I.G., *Waterproofing the Roof, supra*) that Advantage suffered these damages when Central Roofing failed to make the roof waterproof despite assurances that they would do so. (Pl. Ex. W, Doc. 71-23; Central Roofing and Creely Dep. 89:7–90:13, 100–11, Doc. 61-7.) There is evidence in the record that Advantage could have used at least some of these materials again had they not been damaged. (*See* Meadows Dep. 66:19–68:4, Doc. 61-3; Strawbridge Dep. 243:3–11, Doc. 61-5.) In this one respect, summary judgment is denied.

The Court recognizes that other evidence suggests: (1) Central Roofing had a valid reason for not making the roof waterproof because of instructions from the Army (Central Roofing and Creely Dep. 88:11–14, 100:15–102:12, Doc. 61-7); and (2) the materials were either provided to Advantage for free (Strawbridge Dep. 331:2–6, Doc. 61-5) and/or only cost $3,000 (Strawbridge Dep. 331:13–16, Doc. 61-5.), but these are issues left for trial.

### IV. Conclusion

Accordingly,

**IT IS ORDERED** that the *Motion for Summary Judgment* (Doc. 61) filed by Arrow, LLC d/b/a Central Roofing, FCCI Insurance Company, and National Trust Insurance Company (collectively, "Central Roofing") is **GRANTED IN PART** and **DENIED IN PART**. All claims

against Central Roofing are **DISMISSED** except Advantage's claims for the cost of the materials damaged by the rains, that could not be reused, and that needed to be replaced.

**IT IS FURTHER ORDERED** that *Arrow, LLC's Motion for Partial Summary Judgment Against Advantage Roofing and Construction of Louisiana, Inc.* (Doc. 65) and Central Roofing's *Motion to Exclude the Testimony of Dek Terrell* (Doc. 67) are **DENIED WITHOUT PREJUDICE.** Central Roofing is given ten (10) days from the issuance of this ruling to revise these motions and resubmit them, if Central Roofing believes they are necessary in light of the Court's ruling today.

Signed in Baton Rouge, Louisiana, on February 25, 2019.

_____

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**